**WILLIAM S., et al., Plaintiffs,**

v.

**Donald GILL, et al., Defendants.**

**No. 81 C 3045.**

United States District Court,
N.D. Illinois, E.D.

May 20, 1983.

See also 536 F.Supp. 505.

464

Matthew D. Cohen; Canel, Aronson & Whitted, Chicago, Ill., for plaintiffs.

Neil F. Hartigan, Atty. Gen., of Ill., Paul Millichap, Asst. Atty. Gen., of Ill., Chicago, Ill., for defendants Illinois State School Bd., Edward Copeland and Donald Gill.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William S. ("William"), a handicapped minor child, by his mother and next friend Geraldine S. ("Geraldine"), has filed a two-count Second Amended Complaint (the "Complaint") against various state and local educational officials and entities.[1] As to the state defendants[2] the Complaint challenges their concept and practice of distinguishing between "educational" and "noneducational" components of the "related services" needed to enable handicapped students to perform adequately in school. Count I includes a class claim on behalf of all handicapped children adversely affected by the state policy of nonreimbursement for the assertedly "noneducational" components.

Williams has now moved pursuant to Fed. R.Civ.P. ("Rule") 23(c)(1) for a determination that this action is to be maintained as a class action.[3] For the reasons stated in this memorandum opinion and order, William's motion is granted.

### Count I Class Allegations

Analysis of William's class claim first requires a brief excursion into the applicable statutory and regulatory framework. Under the Education for All Handicapped Children Act of 1975 ("EAHCA"), 20 U.S.C. §§ 1401–61, every handicapped child between the ages of three and twenty-one is guaranteed "a free appropriate public education." That federal mandate contemplates the provision of "special education and related services" at public expense. 34 C.F.R. § 300.340. "Related services" in turn are those "required to assist a handicapped child to benefit from special educa-

tion." 34 C.F.R. § 300.13. Thus the placement of a handicapped child in a public or private residential program may qualify as a "related service." Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 34 C.F.R. § 104.33(c)(3). Whether a student needs residential placement to benefit from his or her schooling must first be decided by a multidisciplinary staff conference.

As Illinois' "state educational agency," ISBE is responsible for insuring that:

1. all Illinois agencies (including local school districts) that provide special education or related services comply with EAHCA (20 U.S.C. § 1412(6), 34 C.F.R. § 300.600(a)(2)) and

2. all handicapped children living in Illinois receive a free, appropriate public education (20 U.S.C. § 1412(1) and (6), 34 C.F.R. § 300.600(a)(1)).

ISBE is not relieved from its ultimate responsibilities in that area by the possibility of financial or in-kind assistance from other government or private agencies. 34 C.F.R. § 104.33(c)(1). Illinois' School Code imposes parallel obligations on ISBE. *See* Ill.Rev. Stat. ch. 122, §§ 14–7.02, 14–8.01.

Count I challenges defendants' policy (the "Policy") of disclaiming any obligation to furnish "related services" that primarily serve the handicapped student's noneducational needs, even when such services are also critical to his or her ability to benefit from an education. That disclaimer had its genesis in the August 1980 Memorandum of Understanding (the "Memorandum") executed by ISBE and several other state agencies that provide noneducational assist-

---

1. "State defendants" comprise Illinois State Board of Education ("ISBE"), Illinois Superintendent of Education Donald G. Gill and ISBE Chairman Donald Muirhead. "Local defendants" are Barrington Community District 220 ("District 220"), District 220 Superintendent Clyde Slocum, Special Education District of Lake County ("Special District") and Special District Chairman Larry Vuillemot.

2. Because William's pending motion concerns only the State defendants, for convenience this

opinion will refer to them simply as "defendants."

3. This opinion will follow the conventional though imprecise terminology of describing:

(a) the current motion as one for "class certification"; and

(b) the Rule 23(a) criteria as (1) "numerosity," (2) "commonality," (3) "typicality" and (4) "adequacy of representation."

ance to disabled individuals.[4] That Memorandum (1) defines categories of handicapped children whose needs are considered primarily "noneducational" and (2) absolves ISBE and local school districts from any financial responsibility as to the noneducational facets of residential placements, regardless of whether another state agency supplies the requisite funding.

In accordance with the Memorandum, ISBE amended Rule 8.03 of the Rules and Regulations for the Administration and Operation of Special Education, requiring that representatives of appropriate state agencies be invited to any multidisciplinary staff conference at which "residential placement is contemplated for reasons primarily other than educational." According to the Complaint those representatives often do not attend such meetings, and even when they do they rarely commit their agency's resources to provide "noneducational" services recommended by the conferences. In addition the Complaint alleges (Count I ¶ 43) defendants (as well as local school districts, which must abide by defendants' policy directives) have invoked the Policy in refusing to provide "noneducational" related services other than residential placement.

William, a multiply handicapped child in District 220, was allegedly victimized by the Policy.[5] On September 15, 1980 District 220 held a multidisciplinary conference to consider his request for residential placement. Its multidisciplinary team concluded:

(1) William was a qualified handicapped child eligible for special education services.

(2) Residential placement in a community "homelike environment" was necessary for William to achieve any possible degree of success in school.

(3) Should such an environment not prove workable, the best alternative was residential placement in a private, nonpublic comprehensive treatment center.

On October 25, 1980 District 220 convened a hearing to afford William's parents the opportunity to contest the District's conclusions that:

(1) It was not District 220's responsibility to provide a residential placement to a handicapped child when the reasons for such placement were not "educational."

(2) If William were placed in a "homelike" setting within District 220 boundaries, the District could provide an appropriate "educational" program but was not required to service "noneducational" needs.

(3) Responsibility for serving "noneducational" needs of handicapped children rested with another state agency, *not* the local school district.

District 220's hearing officer formally found William was a multiply handicapped child who required comprehensive therapy involving a noneducational placement. He recommended *noneducational* placement because of Geraldine's lack of training "to deal effectively with a multiply handicapped child"—an incapacity that fostered a "tense, volatile home environment." Therefore he exonerated District 220 and ISBE from financial responsibility for William's placement, except for its purely "educational" features. "Noneducational" costs were to be borne by other state agencies.

Geraldine appealed that decision to the State Superintendent. During the pendency of that appeal, William's parents placed him at the Institute of Logopedics (the "Institute") in Wichita, Kansas, at their own expense. On appeal the Superintendent set aside the hearing officer's recommendation on grounds not relevant here. But the Superintendent's decision allegedly recognized the applicability of the Policy to William:

---

**4.** In part the Memorandum was intended as a response to *Gary B. v. Cronin*, 542 F.Supp. 102 (N.D.Ill.1980), which had condemned ISBE's refusal to pay for the psychotherapy received by Illinois handicapped children at their residential placements.

**5.** In describing William's plight this Court has plagiarized freely from its own earlier opinion that summarized the Complaint's well-pleaded allegations at length. *See William S. v. Gill*, 536 F.Supp. 505, 507–09 (N.D.Ill.1982).

It declared District 220 was not obligated to furnish "related services" needed by William as a result of noneducationally related family difficulties, even were those services indispensable to William's receiving a viable education.

Defendants have not challenged for class certification purposes the substance of those Complaint allegations. However they have adduced evidence to rebut the assertion in Complaint ¶ 48 that other state agencies have failed to offer the "noneducational" services required by William. That evidence indicates:

1. Illinois' Department of Mental Health and Developmental Disabilities ("IDMHDD") offered William an Individual Care Grant to fund his noneducational placement at the Glenkirk School of Lake County. That grant was approved before William's parents unilaterally placed him at the Institute.

2. Geraldine was unenthusiastic about that option and cancelled at least one meeting with Glenkirk representatives to explore their program. One letter from Glenkirk official Pat Beaurline ("Beaurline") suggests Geraldine may have refused to hold any such discussions (Moore Aff. Ex. 8).

William counters with his own evidentiary showing:

1. According to ISBE's own list of residential placement facilities eligible for state funding, Glenkirk (a) specializes in serving mentally retarded children and (b) is not approved for serving children, like William, with hearing impairments or behavioral disorders (Reply Mem. Ex. B).

2. Had William been placed at Glenkirk (which lacked educational programs), he would have been bused daily to a public school. Hence Glenkirk would not have afforded the kind of "integrated, consistent" environment recommended by William's "evaluators". (Geraldine Aff. ¶ 10).

3. Disputing defendants' evidentiary inferences to the contrary, Geraldine Aff. ¶¶ 8–9 says (a) she discussed with Beaurline the possibility of William's placement at Glenkirk and (b) Beaurline then rejected William's application because the Glenkirk staff could not "serve hearing impaired children or protect the retarded children from [William]."

Based on that evidence William concludes IDMHDD's willingness to fund an inappropriate and unavailable residential placement did not alleviate the injury the Policy caused him.

Believing other handicapped students have also been adversely affected by the Policy, William fashioned Count I as a class action. His current motion defines that class as follows:

1. All Illinois children between the ages of three and twenty-one who have been or will be identified by the Multidisciplinary Staff Conference of their local school district as handicapped children requiring special education and related services and who have been or will be refused some or all of those services on the grounds that the child requires such services for primarily noneducational reasons as defined in Item Six, Page 2 of the Memorandum of Understanding of August 26–27, 1980; and

2. All Illinois children between the ages of three and twenty-one who have been or will be refused identification as handicapped children entitled to special education and related services by their local school district on the grounds that the child requires such services for primarily non-educational reasons as defined in the Memorandum of Understanding of August 26–27, 1980 and who do not receive those services from the other state agencies governed by the Memorandum of Understanding.

To vindicate the rights of absent class members, Count I seeks declaratory and injunctive relief that would essentially prevent defendants from continuing to adhere to the Policy.[6] William's class certification

---

**6.** Perhaps to satisfy the class certification pre-

requisites of Rule 23(b)(1) and (2), William has

motion can now be evaluated against this backdrop.

### Rule 23(a) Standards

To maintain a class action William must first satisfy all four requirements of Rule 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Those prerequisites will be dealt with in turn.

### 1. Numerosity

■ To approximate the size of the class, William examined records of administrative proceedings involving requests for special education and related services during the period from January 1, 1979 through June 30, 1982. William contends those documents disclose a minimum of 47 children who qualify as class members:

1. Each of 22 children had been involved in an unsuccessful administrative due process challenge to a local school district's refusal to furnish desired services due to their noneducational nature.

2. Each of 25 children had been refused residential placement on similar grounds by ISBE, after the multidisciplinary staff conference of a local school district had found him or her to be a handicapped individual in need of such placement.

William also argues the class includes a substantial, but unknown contingent of children who:

3. failed to pursue administrative remedies after local schools found them ineligible for services in accordance with the Policy or

4. were or *will be* refused requested services for that reason after July 1, 1982.

Defendants counter that:

1. *Adashunas v. Negley,* 626 F.2d 600 (7th Cir.1980) requires exclusion of those in the third and fourth categories of the purported class because the children have not been identified.

2. 20 of the children identified by plaintiffs do not qualify for class membership, as a close examination of their educational records assertedly confirms.[7]

Neither of defendants' arguments bars a finding of numerosity.

Defendants have grossly misread *Adashunas.* That case certainly did not articulate a per se rule excluding any unidentified class member.[8] At most *Adashunas'* reasoning precludes certification of classes whose functional attributes cannot readily be detected in any absent class member (626 F.2d at 603, footnote omitted):

The plaintiff class consists of children entitled to a public education who have learning disabilities and "who are not properly identified and/or who are not receiving" special education. In the comprehensive discovery undertaken and numerous affidavits filed, it does not appear that there are numerous identifiable children not receiving special education in Indiana, but only suspected-to-exist children with learning disabilities "who are not . . . identified." How does one iden-

---

apparently abandoned two components of Count I's prayer for relief: (1) damages for members whose parents unilaterally obtained "related services" that defendants (and local school districts at defendants' behest) refused to provide pursuant to the Policy (prayers (iii) and (iv)) and (2) an order directing defendants to provide *appropriate* special education and related services to each class member (prayer (v)). *See* R.Mem. 10, 19. This opinion proceeds on that assumption.

7. In reply William defended the inclusion of only 11 of those 20 children, implicitly conceding the ineligibility of the other nine.

8. Indeed, such a rule would clash head-on with the common-place practice of certifying classes that include prospective members. *See* Newberg, *Class Actions* § 1105g, at 177–78 (1977).

tify class members consisting of persons not identified? This might be conceivably possible if identification were a simple process. However, the record abundantly demonstrates that identifying learning disabled children is a gargantuan task.

That concern is not implicated here. In this case the touchstone of class membership—denial of requested services because of the absence of a primary educational need—is an objective fact readily capable of discernment even as to future class members.[9] *Adashunas* is also distinguishable in two other respects:

1. There (626 F.2d at 604–05) genuine uncertainty existed as to whether the ranks of unidentified class members (plus the one named plaintiff who had been identified as a class member) were sufficiently large to satisfy the numerosity requirement. By contrast, the unidentified present and future members of William's class far outnumber the identified ones, however conservative the estimate, for the class will inexorably grow for another 10 years or so—until the Policy has remained in effect for the length of time a typical disabled child stays in the public school system.

2. Undoubtedly *Adashunas* rested in part on the realization (albeit unexpressed) that the relief sought (special education and money damages) necessitated identification of individual class members. Certification of William's class does not raise that spectre, for the class relief sought—invalidation of the Policy—can be implemented without undertaking such a burdensome inquiry.

When unidentified present and prospective members are taken into account, the proposed class is unwieldy enough—both quantitatively and qualitatively—to render joinder impracticable—even were plaintiffs' list of identified class participants pared to 27. In terms of sheer numbers, other courts have in fact certified smaller classes.

**9.** Any individual's exposure to the Policy can obviously be determined without undertaking the "gargantuan task" of ascertaining the nature of his or her handicaps or service needs.

*See* Newberg, *Class Actions* §§ 1105d–1105f, at 174–77 (and cited cases) (1977). But that is not the most significant factor. In this case joinder difficulties are largely attributable to two qualitative factors:

1. the appropriateness of including the numerous children likely to be aggrieved in the future by the Policy and

2. the comparative fluidity of the group of present class members.

*See Williams v. Lane,* 96 F.R.D. 383 at 385 (N.D.Ill.1982). In light of such formidable obstacles to joinder, Rule 23(a)(1) is satisfied.

### 2. *Commonality*

■ As for Rule 23(a)(2), the two principal issues raised by Count I are common to the class:

1. the factual issue whether the Policy actually exists and

2. the legal issue whether the Policy comports with a variety of federal and state requirements.

To defeat commonality, defendants reiterate their previously rejected argument that the class relief sought calls for individualized determinations as to each member's disabilities and his or her unique "related service" needs. In addition to the flaws already identified, that contention fails to recognize the presence of even one common issue can satisfy Rule 23(a)(2). *See Tonya K. v. Chicago Board of Education,* 551 F.Supp. 1107 at 1112 (N.D.Ill.1982). William meets the commonality test as well.

### 3. *Typicality*

■ William's claim is "typical" because it "arises from the same event or practice or course of conduct [the Policy] that gives rise to the claims of the class members and is based on the same legal theory." *Edmondson v. Simon,* 86 F.R.D. 375, 381 (N.D. Ill.1980). Defendants assail the typicality of William's claim on two grounds:

Those members who pursue their administrative remedies can be identified by inspecting the records of such proceedings, as William has done for a two-and-a-half year period.

1. *Fields v. Village of Skokie,* 502 F.Supp. 456 (N.D.Ill.1980) and *Badillo v. Central Steel & Wire Co.,* 495 F.Supp. 299 (N.D.Ill.1980) suggest William's claim is fatally dissimilar to those of two segments of the proposed class: (1) children "who have been or will be refused *identification* as handicapped children entitled to special education and related services" because of the Policy and (2) children who "*will be* identified ... as handicapped children requiring special education and related services and who ... *will be* refused some or all of those services" because of the Policy.

2. Unlike other putative class members, William was not harmed by the Policy because IDMHDD stood ready to accommodate his "noneducational" needs by funding a residential placement at Glenkirk.

Neither of these arguments renders William atypical.

Defendants' attempted reliance on *Fields* and *Badillo* once again illustrates a singular ability to contort precedent. By analogy to Rule 23(a)(3) and (4), both cases articulated the unexceptionable proposition that a named plaintiff lacks standing to challenge, on behalf of absent class members, practices to which he or she has not been exposed:

1. As current employees of defendant, the *Fields* plaintiffs were found "not entitled to assert the rights of *potential* or *prospective* employees—a group to which plaintiffs do not belong—who have allegedly been the victims of discriminatory *hiring* practices." 502 F.Supp. at 460 (emphasis in original).

2. Similarly the *Badillo* plaintiff, who complained of his discriminatory discharge, "lack[ed] standing to sue to protect the rights of others allegedly discriminated against by [defendant's] *nonhiring* on racial grounds." 495 F.Supp. at 305 (emphasis in original).

By contrast William has allegedly suffered from the very same practice—the Policy—that assertedly injured (or will injure) the two subgroups of the class at issue. Moreover, the harm to both William and those absent members is precisely the same: deprivation of financial assistance for "related services." True enough, William's factual situation differs in a few minor respects from their position (in terms of the timing of their injury or their designation as handicapped children). But such factual variations do not implicate typicality concepts where as here "a general course of conduct by defendants has affected all class members." *Stalling v. Califano,* 86 F.R.D. 140, 143 (N.D.Ill.1980).

Nor does defendants' other argument fare any better. As already noted, both sides have adduced conflicting evidence as to the adequacy and availability of the Glenkirk placement option that IDMHDD was concededly willing to fund. But the threshold Rule 23 determination is hardly the proper vehicle for a conclusive resolution of such issues, particularly when that resolution would be dispositive of William's individual claim. This Court will therefore accept William's evidentiary version at this stage. It must also presume ‾the Policy injured William, for defendants do not (at this juncture) quarrel with the Complaint's allegation as to their Policy-grounded refusal to supply William a residential placement.

### 4. Adequacy of Representation

█ Under Rule 23(a)(4) William qualifies as an adequate class representative so long as (1) his counsel are capable of conducting the litigation and (2) his interests are not antagonistic to those of the class. *See Susman v. Lincoln American Corp.,* 561 F.2d 86, 90 (7th Cir.1977). Defendants do not question the ability of William's counsel to prosecute this action. Focusing instead on the other element, they claim the interests of William and the class are discordant because the "related services" desired by many absent members are entirely different from residential placement sought by William. That argument again misperceives the limited scope of the class relief sought—to set aside the Policy. There is certainly solidarity among class members on that score, for the Policy is by definition

responsible for each member's inability to obtain deserved "related services." [10]

### Rule 23(b) Standards

■ Having qualified under each of Rule 23(a)'s preconditions, William need satisfy only one of the alternatives of Rule 23(b), in this case Rule 23(b)(2):

> [T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . .

By withholding "related services" from each class member in accordance with the Policy defendants have clearly "acted or refused to act on grounds generally applicable to the class." And if Count I prevails, *class-wide* injunctive and declaratory relief sought will be appropriate.

### Conclusion

William has satisfied the requirements of both Rule 23(a) and 23(b)(2). Count I is to be maintained as a class action on behalf of the two-component class identified in the paragraph on page 467 of this opinion immediately preceding "Rule 23(a) Standards."

---

**10.** Defendants also advance two other Rule 23(a)(4) arguments, one of which was raised and rejected in the typicality context and the other of which is simply unfathomable. That latter contention attacks William's failure to name any local school district other than District 220. Citing *Adashunas,* defendants reason District 220 cannot adequately represent the interests of the other school districts. That argument makes no sense for three reasons:

    1. Count I's class allegations are not directed to District 220. Hence its ability to represent other districts is irrelevant.

    2. Because the class action component of Count I seeks only to invalidate the Policy, the absence of local school districts as defendants (named or otherwise) will not jeopardize any relief accorded to the class.

    3. Reliance on *Adashunas* is wholly misplaced, for that case merely addressed the ability of named defendants to represent a *defendant* class. District 220 has not been sued as a representative of the class of all Illinois school districts.