**WILLIAM S., et al., Plaintiffs,**

v.

**Donald GILL, et al., Defendants.**

No. 81 C 3045.

United States District Court,
N.D. Illinois, E.D.

Sept. 22, 1983.

Supplement to Memorandum Opinion
and Order Sept. 29, 1983.

Matthew D. Cohen, Canel, Aronson & Whitted, Chicago, Ill., for plaintiffs.

Neil F. Hartigan, Atty. Gen. of Ill., Paul Millichap, Asst. Atty. Gen. of Ill., Chicago, Ill., for defendants Ill. State School Bd., Edward Copeland and Donald Gill.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William S. ("William"), a handicapped minor child, by his mother and next friend, Geraldine S. ("Geraldine"), has filed a Second Amended Complaint (the "Complaint") against various state and local educational officials and entities.[1] William's two-count Complaint challenges defendants' concepts and practice of distinguishing between "educational" and "noneducational" components of the "related services" needed to enable handicapped students to perform adequately in school. Count I is a recently-certified class action seeking declaratory and injunctive relief, while Count II is an individual money claim.

Defendants have now moved (1) alternatively (a) under Fed.R.Civ.P. ("Rule") 56 for summary judgment on William's individual claims in Counts I and II or (b) for reconsideration of class certification of Count I and (2) for recovery of attorneys' fees and costs incurred in briefing the present motions and taking Geraldine's deposition. For the reasons stated in this memorandum opinion and order, this Court grants defendants' summary judgment motion in part but denies their other motions.

*Statutory and Regulatory Background*[2]

Analysis of William's claims first requires an overview of the relevant statutes and

---

1. "State defendants" comprise Illinois State Board of Education ("ISBE"), Illinois Superintendent of Education Donald G. Gill and ISBE Chairman Donald Muirhead. "Local defendants" are Barrington Community District 220 ("District 220"), District 220 Superintendent Clyde Slocum, Special Education District of Lake County ("SEDOL") and SEDOL Chairman Larry Vuillemot.

2. This section is taken almost verbatim from this Court's earlier excursion into the applicable statutory and regulatory framework, as part of its "Opinion II," 98 F.R.D. 463 at 465–66 (1983).

regulations. Under the Education for All Handicapped Children Act of 1975 ("EAHCA"), 20 U.S.C. §§ 1401–61, every handicapped child between the ages of three and twenty-one is guaranteed "a free appropriate public education." That federal mandate contemplates the provision of "special education and related services" at public expense. 34 C.F.R. § 300.340. "Related services" in turn are those "required to assist a handicapped child to benefit from special education." 34 C.F.R. § 300.13. Thus the placement of a handicapped child in a public or private residential program may qualify as a "related service." Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); 34 C.F.R. § 104.33(c)(3). Whether a student needs residential placement to benefit from his or her schooling must first be decided by a multidisciplinary staff conference.

■ As Illinois' "state educational agency," ISBE is responsible for insuring that:

1. all Illinois agencies (including local school districts) that provide special education or related services comply with EAHCA (20 U.S.C. § 1412(6), 34 C.F.R. § 300.600(a)(2)) and

2. all handicapped children living in Illinois receive a free appropriate public education (20 U.S.C. § 1412(1) and (6), 34 C.F.R. § 300.600(a)(1)).

ISBE is not relieved from its ultimate responsibilities in that area by the possibility of financial or in-kind assistance from other government or private agencies. 34 C.F.R. § 104.33(c)(1). Illinois' School Code imposes parallel obligations on ISBE. *See* Ill.Rev. Stat. ch. 122, §§ 14–7.02, 14–8.01.

William's Complaint challenges defendants' policy (the "Policy") of disclaiming any obligation to furnish "related services" that primarily serve the handicapped student's noneducational needs, even when such services are also critical to his or her ability to benefit from an education. That disclaimer had its genesis in the August 1980 Memorandum of Understanding (the "Memorandum") executed by ISBE and several other state agencies that provide noneducational assistance to disabled individuals. That Memorandum (1) defines categories of handicapped children whose needs are considered primarily "noneducational" and (2) absolves ISBE and local school districts from any financial responsibility as to the noneducational facets of residential placements, regardless of whether another state agency supplies the requisite funding.

*Facts* [3]

William is a ten-year-old suffering from severe multiple handicaps: moderate to profound bilateral hearing loss, mild to moderate functional mental retardation and spastic quadriplegia affecting his left side. William suffers up to three to four grand mal seizures per day, though he is on medications that at least to some degree suppress the outward symptoms of the seizures (Geraldine Dep. 96–97, 103).

In 1977 William was living with Geraldine in School District 25, Arlington Heights, Illinois ("District 25"). Because of its inability to provide a program appropriate to William's needs, District 25 agreed to fund his placement at St. John's School for the Deaf in Milwaukee for the 1977–78 academic year (Geraldine Dep. 24). When the placement at St. John's proved highly successful for William, the placement and District 25's funding continued for another year. During 1978 and early 1979 William made considerable progress at St. John's in developing sign language and self-help skills (Geraldine Dep. 25).

All went well until Geraldine moved from Arlington Heights to Barrington, Illinois, within District 220. In June 1979 District 220 told Geraldine it would not pay for William's placement at St. John's, insisting

---

**3.** Much of this factual account is drawn from a still earlier opinion that summarized the Complaint's well-pleaded allegations at length, 536 F.Supp. 505, 507–09 (N.D.Ill.1982) ("Opinion I"). For Rule 56 purposes, this factual presentation is based only on allegations that either (1) rest on uncontroverted evidence or (2) reflect the resolution of evidentiary conflicts in William's favor.

that William participate in a public school program (Geraldine Dep. 26–29).

During that summer William attended a summer school program operated by SEDOL, a cooperative serving District 220 among others. Once William left St. John's he regressed considerably, quickly forgetting his toilet training and becoming very aggressive and destructive at home. During the 1979–80 academic year William attended Hawthorne School ("Hawthorne"), a special education school served by SEDOL. William was assigned to Hawthorne's Hearing Impairment Program, in which he was the only deaf child afflicted with other disabilities (Geraldine Dep. 40).

Throughout this period William's behavior both at home and at school continued to worsen, though in strikingly different ways. At home William "signed up a storm" and was frequently disruptive and violent (Geraldine Dep. 57). At Hawthorne William was exceedingly passive, rarely attempting to communicate with his teacher or peers by sign language (Geraldine Dep. 41). Nor did William benefit much from classroom instruction, for his teacher, Mary Bernardi, had no experience in dealing with multiply handicapped deaf children and had to devote most of her attention to her other pupils who were appreciably more advanced scholastically than William (Geraldine Dep. 141–42).

Extremely frustrated with William's lack of progress at Hawthorne and her inability to cope with him at home, Geraldine tried to place William in a number of residential facilities. In January 1980 she explored the possibility of enrolling William at the Glenkirk School for the Handicapped in Lake Forest, operated by the Glenkirk Association for Retarded Citizens ("Glenkirk Association"). However Glenkirk official Pat Beaurline ("Beaurline") rejected William's application because the staff was ill-equipped to handle William's deafness and behavior disorders (Geraldine Dep. 162). Geraldine then investigated other possible programs, including Michael Reese Hospital, Chicago Read Mental Health Center, the Misericordia Program and the Augusta-

na Nursery, none of which was suited to William's needs.

After those abortive efforts Geraldine became convinced William should be placed in a program with integrated residential and educational components. By early June 1980 Geraldine had identified two candidates: The Institute of Logopedics (the "Institute") in Wichita, Kansas and The Bancroft School North in Owlshead, Maine. Anticipating the reluctance of school authorities to fund such out-of-state placements, Geraldine wrote to 12 doctors and psychologists to solicit their endorsement of those alternatives (Geraldine Dep. 143–47).

On June 30 Geraldine attended a meeting with Illinois Department of Mental Health and Developmental Disabilities ("IDMHDD") representative Chris Moore ("Moore") and District 220 official Rhoda Diamond ("Diamond") to discuss the possibility of obtaining financial assistance from IDMHDD to find a residential placement for William. Two specific alternatives were broached: placing William in a foster home or at a facility ("Glenkirk Campus") the Glenkirk Association had just taken over three weeks earlier (Spector Aff. ¶ 2(a)). Moore and Diamond advised Geraldine to arrange an interview with Beaurline to determine the feasibility of placing William at Glenkirk Campus (Geraldine Dep. 168). Several facets of the proposed placement at Glenkirk Campus should be noted:

1. It featured a full array of therapeutic services, comparable to those furnished at the Institute (Geraldine Dep. 176–80, 192–93).

2. Because Glenkirk Campus offered no educational services, William would have continued to attend Hawthorne's Hearing Impairment Program (requiring a 20-mile round trip bus ride (Def.Mem. Ex.D)).

3. William would have been given a sign interpreter for the portion of the day he would spend at Glenkirk Campus (Beaurline Aff. ¶ 4, Spector Aff. ¶ 2(c)).

4. Glenkirk Campus housed some hearing impaired children and a "great number of mildly or moderately retarded,

behavior disordered children" (Spector Aff. ¶ 2(b) and (4))—children with handicaps similar to William's.

At the meeting Geraldine expressed her lack of enthusiasm toward the Glenkirk Campus/Hawthorne offering. Her primary objection was that the educational and residential components of such an arrangement would be bifurcated (Geraldine Dep. 138). Her skepticism also stemmed from her mistaken belief that (1) the bus commute between the two facilities would be one and one-half hours and (2) Glenkirk Campus was not yet operational (Geraldine Dep. 139, 140). Despite her reservations, on July 9 Geraldine signed a IDMHDD form authorizing the release of her son's confidential clinical records to Glenkirk Association officials to determine whether Glenkirk Campus would be suitable for William (Geraldine Dep. 164–65, Moore Aff. ¶ 3).

Eleven days later William, accompanied by Geraldine, visited the Institute for a battery of tests to determine his eligibility for placement there. On July 23 the Institute confirmed its willingness to accept William. Very impressed with the caliber of Institute's services, Geraldine was "predisposed" at that point to send William there (Geraldine Dep. 172–73).

Two days later William was admitted to IDMHDD's Regional Intake and Habilitation Program ("RIHAP") in Tinley Park, Illinois so his multidisciplinary staff team could develop a "habilitation" plan for him (Geraldine Dep. 149). That RIHAP staffing resulted in an August 19 consensus decision to place William in a foster home rather than an institution (Geraldine Dep. 149–50). On August 27 Geraldine formally applied to IDMHDD for an Individual Care Grant ("ICG") to fund whatever residential placement was secured for William (Geraldine Dep. 165–67, Moore Aff. ¶ 4).

On September 15, 1980 District 220 held a multidisciplinary conference to consider William's request for residential placement. Its multidisciplinary team concluded:

1. William was a qualified handicapped child eligible for special education services.

2. Residential placement in a community "home-like environment" was necessary for William to achieve any possible degree of success in school.

3. Should such an environment not prove workable, the best alternative was residential placement in a private, nonpublic comprehensive treatment center.

Based on the team's recommendations, Geraldine agreed to a trial placement of William with specialized, state-licensed parents who were caring for one multiply handicapped child and three mentally handicapped children. After two days, however, the foster parents concluded they could not provide William with the requisite degree of supervision. Following William's discharge from the foster home placement, Geraldine returned William to RIHAP.

On October 25, 1980 District 220 convened an EAHCA hearing to afford Geraldine (and her former husband) the opportunity to contest the District's conclusions that:

1. District 220 was not responsible for providing a residential placement to a handicapped child when the reasons for such placement were not "educational."

2. If William were placed in a "home-like" setting within District 220 boundaries, the District could provide an appropriate "educational" program but was not required to serve "noneducational" needs.

3. Responsibility for serving "noneducational" needs of handicapped children rested with another state agency, not a local school district.

District 220's hearing officer formally found William was a multiply handicapped child who required comprehensive therapy involving a noneducational placement. He recommended *noneducational* placement because of Geraldine's lack of training "to deal effectively with a multiply handicapped child"—an incapacity that fostered a "tense, volatile home environment." Therefore he exonerated District 220 and ISBE from financial responsibility for William's placement, except for its purely "educational" features. "Noneducational" costs were to be borne by other state agencies. In short, the hearing officer's decision

was based on the Policy. On appeal the State Superintendent endorsed that reasoning, though he set aside the hearing officer's recommendation on grounds not relevant here and ordered another multidisciplinary meeting to develop an Individualized Education Plan for William.

Toward the end of October 1980 William was transferred from RIHAP to Michael Reese Hospital's three-week respite care program. According to Geraldine Aff. ¶ 6, the Michael Reese evaluators recommended to her that William "be placed in a highly specialized residential placement appropriate for hearing-impaired children, with a high degree of structure and consistency." Those recommendations supposedly echoed those previously made by the IDMHDD psychiatrists who examined William in early August: to place William in a "structured residential program which provided total communication to the hearing-impaired and a strong behavioral modification program" (Geraldine Aff. ¶ 7). Those asserted recommendations strongly reinforced Geraldine's "predisposition" to place William at the Institute.

Nevertheless IDMHDD representative Moore perservered in her efforts to prod Geraldine into sending William to Glenkirk Campus. In a November 7 letter Moore urged Geraldine to set up "another meeting" (apparently the first one was cancelled by Geraldine, Moore Aff. ¶ 6) with Beaurline to discuss the appropriateness of Glenkirk Campus for William (Moore Aff. ¶ 6). Several days later Moore advised Geraldine ICG funding had been approved for a *regional* placement (which included Glenkirk Campus but excluded the Institute). In a November 26 letter to Moore, Geraldine's attorney said Geraldine had already placed William at the Institute at her and her husband's expense. That correspondence marked the first time any school or govern-

ment official had been notified of William's enrollment at the Institute. Furthermore, Geraldine took that unilateral action without having made any effort to speak with Beaurline or otherwise investigate the Glenkirk Campus program (Geraldine Dep. 178)—a program of which she was wholly ignorant (Geraldine Dep. 188–89).[4]

Unable to obtain funding for his placement at the Institute, William (through Geraldine) filed this two-count Complaint:

1. Count I seeks on behalf of William and a class of similarly situated handicapped children declaratory and injunctive relief that would essentially prevent defendants from continuing to adhere to the Policy.

2. Count II seeks reimbursement for the cost of William's placement at the Institute, an injunction requiring defendants to fund that placement until William turns 22, attorneys' fees and $500,000 in damages.

Both counts charge defendants' Policy-based refusal to fund William's placement at the Institute violates William's rights to:

(1) and (2): a free, appropriate education—a right claimed under EAHCA, Article X, § 1 of the Illinois Constitution of 1970 and Article XIV of the Illinois School Code, Ill.Rev.Stat. ch. 122, § 14–1.01 et seq.; and

(3) and (4): educational opportunities commensurate with those furnished to handicapped children (as well as non-handicapped children)—a right claimed under Section 504 of the Rehabilitation Act and the Equal Protection Clause of the Fourteenth Amendment.

This Court has already rendered two decisions in this case. Opinion I sustained the Complaint under Rule 12(b)(6), while Opinion II certified Count I as a class action. Against this backdrop defendants' motions can now be addressed.

---

4. Glenkirk Association never formally acted on IDMHDD's referral of William to Glenkirk Campus because of Geraldine's failure to pursue that opportunity (Beaurline Aff. ¶ 5). But Glenkirk Association's willingness to accept William in that program was pretty much assured given (1) the numerous discussions be- tween IDMHDD and Glenkirk Association personnel concerning William's possible placement there (Beaurline Aff. ¶ 4) and (2) their efforts to accommodate William's needs (for example by securing funds for a sign interpreter for William, *id.*).

*Summary Judgment*

Defendants advance several grounds for summary judgment, only one of which extends to all William's claims. This opinion will first address that argument and then explore defendants' specific challenges to each claim.

### 1. Adverse Effect of the Policy on William

▮ Armed with greater evidentiary ammunition, defendants assert a refined version of their earlier argument (rejected in Opinion II) that the Policy did not adversely affect William:

1. Glenkirk Campus/Hawthorne placement option was available to William at IDMHDD's expense and offered "appropriate" special education and related services under William's interpretation of that EAHCA concept.

2. Even were the Glenkirk Campus placement opportunity deemed not "appropriate," Geraldine's "predisposition" to select Institute over any other placement alternative must be viewed as a "supervening force" severing any causal link that might have existed between the Policy and William's injury.[5]

Neither contention warrants summary judgment in defendants' favor:

1. While the *availability* of Glenkirk Campus/Hawthorne placement can no longer be reasonably disputed, factual issues remain as to the *appropriateness* of that offering. As recently construed in *Board of Education of Hendrik Hudson School District v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982), the EAHCA "appropriateness" mandate contemplates the provision of "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruc-

tion." See also *Colin K. v. Schmidt,* 536 F.Supp. 1375, 1387 (D.R.I.1982) (". . . a proposed program that would be detrimental to a handicapped child, causing him to stagnate or regress educationally or emotionally, is not appropriate"). At least two aspects of William's evidentiary showing cast doubt on the appropriateness of the proposed Glenkirk Campus/Hawthorne arrangement:

(a) Geraldine testified William had not benefited (and indeed may have suffered) from the instruction he received during his one-year stint at Hawthorne's Hearing Impairment Program—the same program in which he would have participated under the proposed placement.

(b) Geraldine testified William's condition had deteriorated markedly after he left St. John's (which had provided an integrated residential/educational setting) to attend Hawthorne. That evidence creates a reasonable inference the separation of the educational and residential components of the proposed placement would thwart any educational progress by William.[6]

2. There is no evidentiary support at all for the underlying premise of defendants' second argument: that Geraldine refused to entertain *any* placement alternative to the Institute. Indeed that proposition is belied by Geraldine's willingness to place William in a foster home (the other placement option specifically recommended by defendants) after her "predisposition" had supposedly developed. At worst Geraldine was merely predisposed to reject the Glenkirk Campus placement—a predisposition that was eminently justified if, as must be assumed on the present motion in light of the earlier discussion, that program was not "appropriate" for William.

---

5. At times defendants appear to suggest Geraldine's state of mind is relevant to the appropriateness of Glenkirk Campus. Because the EAHCA concept of "appropriate education" obviously calls for objective standards, this Court need not pause to address that preposterous suggestion.

6. William attempts to strengthen that inference with Geraldine's affidavit stating certain physicians recommended a highly integrated and structured environment for William. However Rule 56(d) bars consideration of such inadmissible hearsay on a summary judgment motion.

### 2. EAHCA Claim

Defendants' Rule 56 assault on the EAHCA claim in Counts I and II is three-pronged:

1. William's proposed placement at Glenkirk Campus was "appropriate" under *Rowley.*

2. William's placement at the Institute could not possibly be "appropriate" in light of the inordinate cost of that Institution.

3. Under *Anderson v. Thompson,* 658 F.2d 1205, 1209–14 (7th Cir.1981), damages are not recoverable under EAHCA except in two limited circumstances not present here.

That first argument has just been rejected in summary judgment terms, so only the second and third require discussion.

■ Little time need be spent on defendants' second contention. As *Rowley,* 102 S.Ct. at 3048–49 makes plain, the appropriateness of an education is a function not of cost but of the actual or potential educational benefits conferred. *Darlene L. v. Illinois State Board of Education,* 568 F.Supp. 1340 at 1345–46 (N.D.Ill.1983), the only authority cited by defendants on this point, merely indicates cost considerations motivated the drafters of EAHCA to mandate an "appropriate" education as opposed to the "most ideal" education possible.

■ But the third time proves the charm for defendants. EAHCA provides in 20 U.S.C. § 1415(e)(3):

During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardians be placed in the public school program until all proceedings have been completed.

That unequivocal provision led our Court of Appeals in *Anderson,* 658 F.2d at 1209–13 to refuse to imply a general damage remedy for the parents' cost of placing their handicapped child in a private program the school district was required to provide. *Anderson,* 658 F.2d at 1213–14 did recognize the availability of damages in two exceptional circumstances: where (1) the "child's physical health would have been endangered had the parents not made alternative arrangements to those offered by the school system" or (2) "the defendant has acted in bad faith by failing to comply with the procedural provisions of Section 615 [20 U.S.C. § 1415] in an egregious fashion." Now that the facts are in, the absence of both those circumstances is beyond question:

1. As for the first exception, the evidence adduced by William at most shows his presence *at home* jeopardized the physical well being of his mother (and possibly himself). But such evidence obviously is unresponsive to the relevant *Anderson* inquiry: whether William's physical health would have been imperiled had he been placed in the Glenkirk Campus/Hawthorne program proposed by defendants. On that score there is no reasonable dispute:

(a) William was not exposed to any "serious risk of injury to [his] physical health" (*Anderson,* 658 F.2d at 1214) during the 1979–80 school term at Hawthorne, and the record reveals no basis for suspecting Hawthorne's continued ability to insure William's safety.

(b) Spector Aff. ¶ 2 demonstrates Glenkirk Campus had sufficient staff and resources to handle handicapped children like William.

2. As for the second exception, William does not impugn defendants' good faith adherence to the procedural safeguards embodied in EAHCA, instead questioning their motives in offering the Glenkirk Campus/Hawthorne arrangement. But that attack on the *substantive* outcome of the EAHCA proceedings is simply irrelevant to the applicability of that *Anderson* exception. Though that is really dispositive of the issue, it also appears William's charge of bad faith rests on inadmissible hearsay (the refusal of

defendants to heed the supposed recommendations of William's independent evaluators and IDMHDD's Chicago Read staff), which Rule 56(d) bars from consideration on a motion for summary judgment.

Accordingly summary judgment will be entered for defendants on Count II's claim for damages under EAHCA.

### 3. Rehabilitation Act § 504

■ As Opinion I (536 F.Supp. at 512) held, the unavailability of damages under EAHCA for wrongful exclusion from benefits forecloses any damage remedy under Section 504 as well. But this opinion need not dwell on that ground for summary judgment, for recent case law developments undercut William's entire Section 504 claim—including its equitable relief component.

In *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979), the Supreme Court construed Section 504 narrowly as requiring "evenhanded treatment of qualified handicapped persons" in existing programs but not mandating "affirmative efforts [to modify such programs] to overcome the difficulties caused by handicaps."[7] In the wake of *Davis,* all courts save one have concluded Section 504 does not obligate a school system to finance a private placement *under any circumstances* (though conceding EAHCA may impose such an obligation). *Colin K.,* 536 F.Supp. at 1388; *Turillo v. Tyson,* 535 F.Supp. 577, 588 (D.R.I. 1982); *see Kruelle v. New Castle County School District,* 642 F.2d 687, 695 (3d Cir. 1981). Those decisions rest on reasoning equally compelling here: Because a residential placement represents a new service not available to non-handicapped students (as distinguished from a modification of an existing service available to non-handicapped students, which was at issue in *Davis*), it follows a fortiori from *Davis* that defendants have no financial responsibility under Section 504 for such a program. Moreover even were the one case to the contrary, *Department of Education, State of Hawaii v. Catherine D.,* 531 F.Supp. 517, 528 (D.Hawaii 1982), correctly decided, it is meaningfully distinguishable in two respects:

1. Unlike the Institute placement (which costs about $40,000 annually), the private school placement contemplated in *Catherine D.* cost less than $1,200 per year (the ceiling established by administrative regulation). Thus it did not entail any "undue financial and administrative burdens"—one of the major concerns that animated the *Davis* holding.

2. Unlike William, the handicapped child in *Catherine D.* could not have attended *any* public school program.

Accordingly William's Section 504 claim must be jettisoned.[8] It too is out of the case.

### 4. Equal Protection

■ As for William's equal protection claim, defendants contend application of the Policy to William did not discriminate invidiously against William's right to education. Opinion I (536 F.Supp. at 511) rejected this argument in a Rule 12(b)(6) context. As Opinion I explained, to defeat William's equal protection claim defendants must "ei-

---

**7.** *Davis,* 442 U.S. at 412, 99 S.Ct. at 2370 did intimate Section 504 might demand affirmative action when no "undue financial and administrative burdens [would be imposed] upon a State."

**8.** Defendants' other argument for summary judgment on that claim—William's failure to exhaust those Section 504 administrative procedures not available under EAHCA—is patently frivolous. Even the authority they cite for that proposition said (*Calhoun v. Illinois State Board of Education,* 550 F.Supp. 796, 802 (N.D.Ill.1982) (brackets in original)):

The applicability of state administrative remedies under the EAHCA to section 794 actions is explicitly recognized by 34 C.F.R. § 104.36, which states, 'Compliance with the procedural safeguards of section 615 of the Education of the Handicapped Act is one means of meeting this requirement [for procedural safeguards].'

*Calhoun* had rejected an EAHCA claim for nonexhaustion of administrative remedies, then simply went on to say its decision could not be circumvented by adding a Section 504 claim.

ther (a) ... rebut the allegation of deprivation or (b) ... justify the deprivation by asserting some legitimate state interest." Because defendants have not proffered any evidence on either subject, that claim survives their summary judgment motion.[9]

### 5. State Law Claims

Defendants seek the dismissal of William's state law claims under *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However because William's federal claims have passed Rule 56 muster, this Court will continue to exercise pendent jurisdiction over those state claims.[10]

### Motion To Reconsider Class Certification

■ Defendants argue unpersuasively Count I should be decertified as a class action because the availability of a unique defense to William's individual claims—the absence of any harm to William as a result of the Policy—disqualifies him from serving as a class representative under the typicality requirement of Rule 23(a)(3). There is simply no basis for presuming the need to rebut that defense will impair William's ability to vindicate Count I on behalf of the entire class, for the gravamen of that count—the invalidity of the Policy—remains of central importance to William's individual claims.

Defendants grossly distort the case law in asserting "it is well settled in this Circuit that where the representative party is subject to unique defenses his claim is not typical of the class" (Def. Mem. 19). Cases cited by defendants merely regard that circumstance as a factor that *may* inform the

District Court's decision on class certification. *See, e.g., J.H. Cohen & Co. v. American Appraisal Ass'n, Inc.,* 628 F.2d 994, 998–99 (7th Cir.1980).

### Attorneys' Fees and Costs

Defendants seek attorneys' fees and costs as compensation for their efforts to refute the exceedingly deceptive representation in Geraldine Aff. ¶ 9, drafted by William's counsel:

> Pat Beaurline of Glenkirk School informed me that Glenkirk specialized in serving retarded children, but not children who were deaf or behavior disordered. Ms. Beaurline rejected Billy's application on the grounds that she could not train her staff to serve hearing impaired children or protect the retarded children from Billy.

That affidavit testimony was tendered to counter defendants' Rule 23(a)(3) argument that "[u]nlike other putative class members, William was not harmed by the Policy because IDMHDD stood ready to accommodate his 'noneducational' needs by funding a residential placement at Glenkirk" (Opinion II at 15). As William now concedes, that affidavit assertion referred to Geraldine's abortive efforts to enroll William at the Lake Forest Glenkirk facility, *not* Glenkirk Campus. Hence the Beaurline representation was really irrelevant to defendants' Rule 23(a)(3) argument.

Counsel thus misled opposing counsel and this Court, which understood the affidavit as describing the Glenkirk Campus placement option (that was plainly the context in which the affidavit was offered). Opinion II relied on that evidence (as well as Wil-

**9.** This Court cannot subscribe to the narrow interpretation of the Equal Protection Clause articulated in *Timms v. Metropolitan School District of Wabash County,* EHLR DEC 554:361 (S.D.Ind.1982). In this Court's view, that constitutional guarantee is implicated not only by the total exclusion of handicapped children from an educational program but also by the denial of supplementary services indispensable to their ability to benefit from those educational programs in which they are allowed to participate. In short, this Court disagrees with *Timms'* refusal to entertain an equal protection

claim based on "a *functional* exclusion from an educational program." *Timms, id.* at 554:369 (emphasis added).

**10.** Judge Bua of this District Court, after following one of this Court's and one of Judge Marshall's post-*Anderson* decisions as to the scope of EAHCA private remedies, has recently held Illinois state claims subject to identical limitations. *Max M. v. Thompson,* 566 F.Supp. 1330, 1338–39 (N.D.Ill.1983). That question has not yet been posed by the parties here.

liam's evidence concerning the inadequacy of the Glenkirk Campus offering) in rejecting defendants' argument.

Needless to say, this Court is most disturbed by the undeniably deceptive thrust of Geraldine Aff. ¶ 9. Counsel's good faith in drafting that affidavit is particularly suspect, for just four days before Geraldine signed the affidavit Beaurline had apprised counsel that William's application to the Glenkirk Campus program had never been accepted or denied (Beaurline Aff. ¶ 6).

 Despite counsel's possible breach of his Rule 11 obligations, it is inappropriate to tax William or his counsel with defendants' attorneys' fees and costs, for defendants themselves have not really been prejudiced by such misconduct. Even had Geraldine's representation not been made, this Court would still have rejected defendants' Rule 23(a)(3) argument on the strength of William's evidence as to the asserted inappropriateness of the Glenkirk Campus placement. Nor were defendants put to needless expense in refuting that representation to bolster their motion for summary judgment. They had to make their affirmative showing as to availability of the Glenkirk Campus placement in any event to meet their burden of proof under Rule 56.

What *is* at issue however is preserving the integrity of the justice system. If a deliberate false-light framing of the affidavit *was* involved, William's counsel should be sanctioned. Counsel are ordered to file within 14 days a statement elaborating on the facts, to enable this Court to determine what if any further action is appropriate.

### Conclusion

Defendants' summary judgment motion is granted only as to (1) William's claim for damages under EAHCA and (2) the Section 504 claim. Defendants' motions for reconsideration of class certification and for an award of attorney's fees and costs are denied.

### SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court rendered its most recent memorandum opinion and order (the "Opinion") in this action just over a week ago, granting in part and denying in part defendants' summary judgment motion. Unknown to this Court at the time it wrote, our Court of Appeals had only three days earlier spoken to some of the same issues in *Timms v. Metropolitan School District of Wabash County, Indiana,* 718 F.2d 212 (7th Cir. 1983).[1]

*Timms* at 215–16 reinforces this Court's views under the Education for All Handicapped Children Act of 1975 ("EAHCA")—views that in substantial part had been stated in reliance on the Court of Appeals' earlier opinion in *Anderson v. Thompson,* 658 F.2d 1205, 1209–14 (7th Cir.1981). And *Timms* at 216–18 teaches EAHCA is the *exclusive* federal remedy so as to bar relief under Rehabilitation Act § 504—it expressly closes any possible avenue for relief under Section 504, confirming the appropriateness of this Court's ruling (572 F.Supp. at 517) jettisoning William's Section 504 claim.[2]

Accordingly this Court's current decision is in full accord with *Timms,* and the Opinion is reaffirmed.

---

1. Opinion at 518 n. 9 expressed disagreement with the reading of the Equal Protection Clause by the lower court in *Timms.* Nothing in the Court of Appeals' opinion dealt with that subject, so this Court finds no reason for reexamination of that portion of its own opinion (based as it was on defendants' failure to offer any evidence).

2. Indeed *Timms* at 217 found "unpersuasive" a number of earlier cases, including this Court's earlier opinion in this case (536 F.Supp. 505, 511 (N.D.Ill.1982)), that had considered a valid Section 504 claim could be stated (though not for damages) for a state's refusal to fund "related services" that were a precondition to a handicapped child's ability to learn.