**ZVI D., by his mother and next friend, Shirley D., individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Gordon AMBACH, Individually and as Commissioner of Education of the State of New York; Board of Education of the City School District of the City of New York; Frank Macchiarola, Individually and as Chancellor of the New York City Board of Education; Christy Cugina, Individually and as Executive Director of the Division of Special Education of the New York City Board of Education; Patricia Vitacco, Individually and as Chairperson of the District 20 Sub-Committee of the Committee on the Handicapped of the New York City Board of Education, Defendants.**

**No. 81 C 2084.**

United States District Court, E. D. New York.

Aug. 18, 1981.

Steven M. Bernstein, Community Action for Legal Services, Inc., Brooklyn, N. Y. (Joel B. Lieberman, Brooklyn, N. Y., of counsel), for plaintiffs.

Allen Schwartz, Corp. Counsel, New York City (Gregg M. Mashberg and Diane Morgenroth, New York City, of counsel), for city defendants.

Robert Stone, Albany, N. Y. (John V. Tauriello, Albany, N. Y., of counsel), for defendant Ambach.

Legal Aid Society, Juvenile Rights Div. (Henry S. Weintraub, Brooklyn, N. Y., of counsel), amicus curiae.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff Zvi D., by his mother, Shirley D., brought this action against the New York State Commissioner of Education, the New York City Board of Education, its Chancellor and its Executive Director of the Division of Special Education, and the Chairperson of the District 20 Subcommittee of the Board of Education's Committee on the Handicapped. Plaintiff has moved for an order preliminarily enjoining defendants from transferring him to a public

school program for the handicapped until they conduct an evaluation of his private placement and find it to be inappropriate to his educational needs. He also seeks an order directing reimbursement to Shirley D. for the cost of her son Zvi's education at The Alternative School beginning with the 1980–81 school year and continuing until the completion of all judicial proceedings. Plaintiff also requests a determination that this action may properly be maintained as a class action and seeks certification of a class of plaintiffs.

The papers submitted on the motion were supplemented by testimony by Yitzchak Kasnett, Dean of Students of The Alternative School, given at a hearing on July 16, 1981. On consideration of all the evidence the court concludes that the motion should be denied.

I

Zvi, born on September 12, 1964, has a minimal brain dysfunction. He attended public school until the third grade and then was placed in Ber Shmud Yeshiva. His mother was not satisfied with his progress at the Yeshiva, and in the fall of 1977 he was brought for evaluation to the Interborough Developmental and Consultation Center, Inc., which recommended that he enter a slow-learning class and expressed approval of The Alternative School as a day treatment center for learning disabled boys. On December 5, 1977 his mother enrolled him in The Alternative School, where he has since continued. At the time of his enrollment the District 20 Committee on the Handicapped (the Committee) had not evaluated him or made a placement recommendation.

On April 17, 1978 the Committee's Evaluation and Placement Unit classified him as having a minimal brain dysfunction and recommended placement in a Health Conservation 30 (HC–30) class. The Committee later recommended that he be placed in such a class at JHS 223, a New York City public school. His mother requested an impartial hearing to contest the recommendation. Before the hearing was held the mat-

ter was settled by letter agreement dated November 27, 1978. This agreement provided that the Committee would fund his placement in The Alternative School for the 1978–79 school year but not for the 1977–78 school year. The agreement also provided:

This funding is being provided with the stipulation that a review of Zvi's classification will be conducted at the end of the current year with a view toward placing him in an appropriate public program in September, 1979.

In May 1979 the Committee re-evaluated Zvi for the 1979–80 school year and recommended he be placed in an HC–30 class at New Utrecht High School. On August 29, 1979 his mother challenged this on the grounds that the agreement dated November 27, 1978 placed him in the "Riley Reid" and "Kelly" classes of children, whom the Commissioner of Education had ordered not transferred from their existing private placements unless those placements were found inappropriate. See In the Matter of Riley Reid, 17 Ed.Dept.Rep. 127 (October 12, 1977); Matter of Kelly, 15 Ed.Dept.Rep. 427 (April 6, 1976). On September 28, 1978 Hearing Officer Scott J. Burnham found that Zvi was not a member of the "Riley Reid" or "Kelly" classes.

Hearings were thereafter held commencing April 16, 1980 to determine whether Zvi's classification and placement as recommended by the Committee were suitable. On July 9, 1980 Impartial Hearing Officer Harry Weintraub found that Zvi was properly classified as having minimal brain dysfunction and that placement in the HC–30 class at New Utrecht High School was appropriate. However, the Hearing Officer also found that the Committee had violated a ruling of the Commissioner of Education by failing to have a physician present at the conference on May 29, 1979 at which Zvi's classification was determined. Because of this error, the Hearing Officer granted funding for the school year 1979–80 to The Alternative School. He also ordered that the case be remanded to the Committee to re-evaluate Zvi and recommend an appropriate classification and placement for the 1980–81 school year.

The Committee re-evaluated him and on July 17, 1980 recommended he be placed in the HC–30 class at New Utrecht High School with counseling as a supportive service. His mother objected and requested review at an impartial hearing. This was held before Hearing Officer Weintraub, who on December 17, 1980 upheld the recommendation and ordered that public funding at The Alternative School be denied for the school year 1980–81. The New York State Commissioner of Education (the Commissioner) dismissed the appeal on April 6, 1981. This suit followed.

## II

Under the Education of the Handicapped Act, 20 U.S.C. § 1401 *et seq.*, a state wishing to qualify for federal funds must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free appropriate public school education." 20 U.S.C. § 1412(1). The state must also establish "procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B).

A parent challenging the placement of a child is entitled to an impartial due process hearing by the state or local educational agency. 20 U.S.C. § 1415(b)(2). If the hearing is conducted by a local educational agency, a parent aggrieved by the decision may appeal to the state educational agency. 20 U.S.C. § 1415(c). If the decision remains adverse, the parent may bring action in any state court of competent jurisdiction or in a United States District Court, and the court must review the proceedings, basing its decision on the preponderance of the evidence. 20 U.S.C. § 1415(e)(2).

To prevail in his motion for a preliminary injunction, Zvi must make "a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Caulfield v. Board of Education of City of New York*, 583 F.2d 605, 610 (2d Cir. 1978) (emphasis in original).

██ He contends that the Hearing Officer and Commissioner erred in finding appropriate his placement in the HC–30 class at New Utrecht High School. He relies on the fact that his rate of truancy had fallen markedly while a student at The Alternative School—from 49 percent in 1977–78 to 33 percent in 1978–79 to 12 percent in 1979–80 and up to 21 percent in 1980–81. Dean Kasnett was of the opinion that the procedures used by New Utrecht High School to cope with truancy—calling home and, if there is no response, sending a truancy officer—would be ineffective as to Zvi because three or four weeks may pass before the truancy officer would come by and compel his return.

Kasnett also described Zvi's progress at The Alternative School. He has improved significantly in academic achievement since coming to the school in 1977. When he first entered he was a non-verbal gesturing child on the periphery of social and classroom events. He now gets along successfully within the school but still tends not to socialize outside his family. Based upon Zvi's problems with truancy and relationship with others, Kasnett gave his opinion that it would not be appropriate at this time for Zvi to be educated in a public school with children who are not handicapped.

Hearing Officer Weintraub's December 17, 1980 decision found that the evaluation of Zvi indicated improvement in his educational performance and a reduction in emotional stress. He worked in a grocery store with increased responsibility and was much improved. The school psychiatrist found moderate hyperactivity, shortened attention span, minimal brain dysfunction, and clini-

cally dull normal intelligence with higher potential, and concluded that "there is no major psychopathology present to warrant a diagnosis of emotional disorder." Hearing Officer Weintraub noted that New Utrecht High School offers a less restrictive environment and vocational and educational opportunities not available at The Alternative School.

The state agency's determination as to Zvi's placement in the HC–30 class at New Utrecht High School is supported by a preponderance of the evidence. Federal law requires that handicapped children be educated "to the maximum extent appropriate" with children who are not handicapped. 20 U.S.C. § 1412(5)(B); *Concerned Parents & Citizens For Continuing Education at Malcolm X (PS 79) v. New York City Board of Education*, 629 F.2d 751, 754 (2d Cir. 1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981). The Alternative School educates only handicapped children. In light of Zvi's marked improvement in educational performance, social skills, and emotional stability, the Committee reasonably decided that he should be placed in an HC–30 class and provided with the additional vocational and educational opportunities at New Utrecht High School.

The court recognizes the problem of truancy, but there is no evidence that this problem cannot be resolved successfully at New Utrecht through the joint efforts of Zvi, his mother, and school authorities. The court also realizes the progress he has made at The Alternative School. But this is not a justification for continuing to keep him in a school with handicapped children only, but rather may enable him successfully to receive education in a less restrictive environment.

### III

Zvi argues that, even if the proposed placement is appropriate, he cannot be removed from The Alternative School unless the Committee finds that this school is inappropriate for him. He relies on a trilogy of decisions issued by the Commissioner in *Matter of Riley Reid.*

Those proceedings were brought on behalf of a class of handicapped children in New York City who alleged that they were being deprived of their statutory right to receive appropriate educational services in the public school system. In a November 26, 1973 decision the Commissioner found deficiencies in the manner in which the City was serving the educational needs of these handicapped children. Those deficiencies included undue delays in examinations and diagnostic procedures and a failure to place handicapped children in suitable programs. 13 Ed.Dept.Rep. 117, 120 (1973). As a remedy the Commissioner ordered that all students diagnosed as handicapped be placed immediately in appropriate public school classes or, if such classes were not available, in appropriate private schools. *Id.* at 121. He also ordered the City Board of Education and the Chancellor of the New York City School District to submit to him by February 1, 1974 a plan to eliminate waiting lists for diagnosis and placement. *Id.*

In a decision dated September 2, 1977 the Commissioner found that the City had "not satisfactorily complied with the prior order, although certain measures have been taken and certain progress made." 17 Ed.Dept. Rep. 72, 74 (1977). He noted that more than 2,100 handicapped children were on waiting lists for placement in special education programs in September 1976 and found that "it is clear that many such children will remain unserved in school year 1977–78 unless special measures are taken by respondents." *Id.* at 75. To alleviate this problem, the Commissioner ordered that within thirty days after diagnosis or after the date of the order, if that be the later date, all handicapped children must be placed in suitable programs and, upon failure to effect such placement, the City must bear the expense of any private placement chosen by the parent of the child in any approved school. *Id.* at 77–78. The Commissioner also ordered that pending his further order, the City not transfer any handicapped child "currently attending a private school" under contract with the Board of Education to a program operated by the

City "unless the committee on the handicapped finds that the current placement is no longer appropriate." *Id.* at 78.

The City's request to delete the prohibition against transfers from private schools was rejected by the Commissioner in a decision dated October 12, 1977:

> Respondents [the City Board of Education and the Chancellor] recognize that this prohibition is temporary until the long waiting lists are eliminated, and they also recognize that it was imposed in response to respondents' longstanding failure to provide a sufficient number of programs in a timely manner. Although respondents now assert a firm commitment and even a confidence in their ability to quickly begin to meet their legal obligation to provide an appropriate public education program for all handicapped children who choose to avail themselves of such services, I will hold in abeyance any decision to remove the prohibition against transfers from private placements made under contract with the board of education or pursuant to Commissioner's order. Such transfers, for the present, are to occur only when the current, private placement is no longer appropriate for the child's needs. 17 Ed. Dept.Rep. 127, 130 (1977).

Zvi contends that under these orders of the Commissioner defendants may not transfer Zvi from his placement at The Alternative School unless the Committee finds that this placement is no longer appropriate. Defendants argue that Zvi's reliance on *Matter of Riley Reid* is misplaced because he enrolled at The Alternative School on December 5, 1977 and the Commissioner's decision "applied only to children in private schools who had not been offered placements by respondent's COH before September 2, 1977." *Matter of a Handicapped Child*, 19 Ed.Dept.Rep. 514, 515 (March 31, 1980); *Matter of a Handicapped Child*, Dec.No. 1053 at 5–6 (Comm.Ed. April 6, 1981).

Zvi replies that the deficiencies which provoked the Commissioner on September 2, 1977 to order the prohibition against transfers from private schools still continue. On that date the Commissioner noted that 2,100 handicapped children were on waiting lists for placement in special education programs. As of April 30, 1981, 1,833 such children awaited placement. Zvi argues that it would be improper for defendants to remove the remedy before they have substantially mitigated the problem.

██ The court, however, need not decide whether the prohibition against transfers from private schools is required by the Commissioner's orders because Zvi has no standing to assert this claim. The question of standing involves both constitutional and prudential limitations on federal court jurisdiction. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). To satisfy the constitutional requirement of a "case or controversy," a plaintiff must show that he has suffered actual or threatened injury that is likely to be redressed by a favorable decision. *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Zvi has satisfied this requirement. But a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra* 422 U.S. at 499, 95 S.Ct. at 2205. Zvi has failed to satisfy this policy against third-party standing.

The order prohibiting the transfer of any handicapped child from a private school without appropriate findings was imposed to help eliminate waiting lists of handicapped children awaiting placement. The order is thus a remedy addressed to waiting lists, not an entitlement to private school education. *See* 45 C.F.R. § 121a.403 (1980) (public funding of private schooling for handicapped children permitted only when no free appropriate public school placement available). To the extent the order creates legal rights, those rights belong to handicapped children awaiting placement, not to those placed in private schools. A placement is available for Zvi at New Utrecht High School.

This is not a case where third parties cannot readily assert their rights. *Compare Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953) (sellers of housing given standing to claim rights of buyers to challenge racially restrictive covenant). Indeed, the third parties whose rights Zvi purportedly asserts have been ably and successfully represented by counsel in *Jose P. v. Ambach*, 79 Civ. 270, now before this court.

To restrict standing to handicapped children awaiting placement is consistent with Judge Weinstein's decision in *Lora v. Board of Education of City of New York*, 456 F.Supp. 1211 (E.D.N.Y.1978), *vac. and rem.*, 623 F.2d 248 (2d Cir. 1980). He found that the public special day schools for emotionally handicapped children were racially segregated. 456 F.Supp. at 1285. The racial composition in these schools as of October 31, 1977 was 68 percent Black, 27 percent Hispanic, and only 5 percent other, primarily white. In contrast, the racial composition in the New York City public school equivalent grades were 36 percent Black, 23 percent Hispanic, and 41 percent other. 456 F.Supp. at 1214.

He noted that this racial disparity was caused in part by the fact that some parents are more likely than others to place their children in private schools. 456 F.Supp. at 1252. "Substantial testimony was developed, however, indicating that the middle class is able to manipulate the system to provide public funding for this escape from public schools." *Id.*

To remedy the racial disparity Judge Weinstein ordered, among other things, that the City "take steps to prevent the unnecessary use of private schools at public expense." He directed that private school placements be made only where "appropriate", and in new cases the maintenance of records showing, among other things, the child's race and handicapping condition, and the specific reasons for the recommendation and for finding the public school placement to be inappropriate. He also ordered that the City "shall pay for a student's education in a private school only if an appropriate public educational program is not available within the New York City public school system." *Lora v. Board of Education of City of New York*, 75 Civ. 917 (unpublished Final Order July 2, 1979). This order of the court is still in effect. *Lora v. Board of Education of City of New York*, 75 Civ. 917 (unpublished Supplementary Order June 3, 1980).

To allow standing in this case would aggravate the problem that Judge Weinstein sought to remedy and would tend to hinder compliance with his order "to prevent the unnecessary use of private schools at public expense."

The motion for a preliminary injunction against transferring Zvi to a public school program is denied.

### IV

Since Zvi has no standing to present the claim discussed above, plainly he may not maintain the action as a class action.

### V

Zvi also seeks a preliminary injunction directing the Committee on the Handicapped and the Board of Education to reimburse The Alternative School for the cost of Zvi's education in the 1980–81 school year and to continue to bear the cost of his education at that school until the completion of these proceedings, including further appeals. Zvi recognizes that money damages generally provide an adequate remedy for claims of reimbursement. But he argues that he will be irreparably harmed if he is not enrolled in The Alternative School which his family cannot afford.

The claim for reimbursement is based on 20 U.S.C. § 1415(e)(3) which provides:

During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child. . . .

This provision has been interpreted to mean "that while the procedures for administrative hearing, administrative review and

judicial review mandated by Congress were being employed, the status quo should be preserved unless it was altered by consent." *Stemple v. Board of Education of Prince George's County*, 623 F.2d 893, 898 (4th Cir. 1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). The provision is regarded essentially as "an automatic preliminary injunction" maintaining the child's then current educational placement; but "unlike a preliminary injunction, the statute replaces the Court's discretionary consideration of irreparable harm and likelihood of success on the merits with an absolute rule in favor of the status quo." *Monahan v. State of Nebraska*, 491 F.Supp. 1074, 1088 (E.D.Tenn.1980) (citations omitted), *aff'd in part and vac. in part*, 645 F.2d 592 (8th Cir. 1981).

This provision has been held to require the school district to continue to fund an educational placement which it funded prior to the commencement of proceedings. *Monahan v. State of Nebraska, supra*, 491 F.Supp. at 1089. Conversely, if the school district did not fund the placement when the proceedings were initiated, it is not required to provide funding during the pendency of the proceedings. *Id.* at 1089–90; *Stemple v. Board of Education of Prince George's County, supra*, 623 F.2d at 897–98.

For purposes of this "status quo" provision, proceedings commence when a parent or guardian of the child presents a complaint to the local school district regarding the evaluation or educational placement of the child. 20 U.S.C. § 1415(b)(1)(E); *Monahan v. State of Nebraska*, 491 F.Supp. at 1089. In the present case it is not clear from the record exactly when Zvi's mother submitted the complaint but it must have been some time after July 17, 1980 when the Committee again recommended placement in the HC–30 class at New Utrecht High School and before October 15, 1980 when the impartial hearing was held.

During this period Zvi was not promised and did not receive any public funding for his private education at The Alternative School for the 1980–81 school year. In fact, he received public funding for the school year 1979–80 as a result of Hearing Officer Weintraub's decision of July 9, 1980 ordering public funding for that single year because the Committee failed to have a physician present at the conference deciding Zvi's classification.

■ When Zvi attended The Alternative School for the 1980–81 school year, he did so in spite of the Committee's contrary recommendation. Since he was not promised and was not receiving public funding when the proceedings were initiated and since he began the new school year in his private program without any new assurances, he is not entitled to public funding during the pendency of the proceedings. *See Monahan v. State of Nebraska, supra; Stemple v. Board of Education of Prince George's County, supra*.

Zvi argues for a different interpretation of the status quo provision, 20 U.S.C. § 1415(e)(3). He maintains that a handicapped child who receives public funding in a private school program for the 1979–80 school year and who is transferred to an appropriate public school special education program for the 1980–81 year may challenge the transfer, unilaterally enroll in his previous private school program, and be entitled to public funding for his education there as long as the proceedings are pending. The court does not accept this interpretation.

If such were the law, a parent with a handicapped child in a private placement at public expense could defeat any efforts to transfer the child to an appropriate public school placement merely by invoking the procedural safeguards of 20 U.S.C. § 1415. When the Committee, after evaluating the child, recommends a transfer for the next school year, a parent may submit a complaint and request an impartial hearing. If this is not successful, she can appeal the decision to the Commissioner. If this fails, she can seek judicial review in a federal district court, appeal any adverse decision to the Court of Appeals, and eventually apply for certiorari to the Supreme Court. According to Zvi's view, the complaining

parent can enroll her child in the previous private placement for the new school year and receive public funding while the process of review drags on. When the legal battle finally closes and no recourse remains, so much time will have elapsed that a new evaluation and placement of the child will be needed. This would offer the opportunity for new proceedings and begin the process of delay anew.

Zvi's interpretation is inconsistent with the federal policy embodied in 45 C.F.R. § 121a.403(a), which provides in part:

> If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility.

It would also permit, indeed encourage, people "to manipulate the system to provide public funding for [their] escape from public schools." *Lora v. Board of Education of City of New York, supra*, 456 F.Supp. at 1252. Congress could hardly have intended that a handicapped child educated in a private school with public funding could thwart indefinitely a school district's attempt to transfer him to a public school.

It is far more sensible to read the status quo provision as preventing a child who is being publicly funded in a private program for the school year from being transferred from the program during that school year when he challenges the transfer and his challenge is still being adjudicated. This interpretation generally would permit a child who disagrees with a new placement to finish the school year in his existing placement, and would recognize how difficult it can be for a handicapped child to be required to change schools during the school year.

The claim for an order directing reimbursement of The Alternative School is denied.

### VI

The motion for a preliminary injunction is denied. So ordered.