[No. A021929. First Dist., Div. One. July 30, 1985.]

In re JOHN K., a Minor.
RICHARD LA POINTE, as Superintendent, etc., et al.,
Plaintiffs and Respondents, v.
JOHN K., a Minor, etc., et al., Defendants and Appellants;
WILSON RILES, as State Superintendent, etc.,
Defendant and Respondent.

COUNSEL

Lawrence Siegel for Defendants and Appellants.

Marchmont J. Schwartz, Margery Q. Lee, Trembath, McCabe, Schwartz, Evans & Levy for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

OPINION

NEWSOM, J.—Respondents brought an action in the Superior Court of Contra Costa County for declaratory relief under the Education of the Handicapped Act (20 U.S.C. § 1400 et seq.; hereafter, the Act), and corresponding provisions of the California law (Ed. Code, § 56000 et seq.), seeking review of two administrative decisions of the State Superintendent of Public Instruction pursuant to which respondents were ordered to reimburse appellants for the cost of private school placement. After a hearing, the trial court reversed the administrative rulings as "counter to law and fact," and found that respondents were not obligated to reimburse appellants for the costs of placement of John K. in a private residential educational facility. The facts relevant to the appeal are as follows.

John K. (hereafter John) was born in Illinois in 1963. He suffered from a speech disability at the age of five, and was given therapy which apparently remedied the problem.

By November of 1973, John was first characterized as educationally handicapped. In September of 1974, it was recommended that he receive psychological counseling along with medication, and continue in an educationally handicapped program to deal with his learning disability.

In March of 1976, according to a school appraisal test, John was classified as suffering from a mild learning disability; a resource specialist program at the Los Medanos Campus of the Moraga School District was recommended. His parents agreed with this placement.

In November of 1976, with the passage of the Act, the first Individualized Education Program (IEP) was established for John. His improvement, including successful partial integration into regular classes, was noted. In June of 1977, a second IEP was devised for John, which recommended that he continue in a regular program, supplemented with minimal special services. Another IEP was done in September of 1977; once more John seemed to be progressing fairly well, and it was agreed that he would remain in a regular program with some assistance from a resource specialist in language, writing, spelling, composition and grammar.

John's performance and behavior deteriorated substantially during the course of the 1977-1978 school year—he was in the eighth grade at the time. His resource specialist, Rose Overacker, observed in John increased hostility, anger, and rebelliousness, and conveyed her concerns to the boy's parents. At a review session in February of 1978, John's parents agreed to continue with the IEP implemented the previous September.

At the end of the 1977-1978 school year, John was removed from school for slashing the tires on a teacher's car. He was nevertheless permitted to graduate from the eighth grade, although his grades were very poor.

In August of 1978, John ran away from home. He was later charged with trespassing and malicious mischief, made a ward of the juvenile court, and released to the custody of his parents. On August 22, 1978, he was assessed by the Lafayette Therapy Center, and described as "self-destructive," with "poor impulse control."

In the fall of 1978, John was enrolled in the local public high school, Campolindo. Respondent school district concluded a staff review of special education students, including John, with the participation of his parents, and it was tentatively decided that his IEP would remain unchanged in high school.

After commencing high school at Campolindo on September 6, 1978, John was made a ward of the juvenile court the following day. He was thereafter repeatedly truant from school, and ran away from home between September 14 and 20, 1978. He was charged with several offenses during this period: violation of a court order, possession of marijuana, and joyrid-

ing. His absence from school made it difficult for the Campolindo resource specialist to test, evaluate and assess him, or develop an IEP.

Due to his continual truancy, John was suspended from Campolindo on October 2, 1978, without prior consultation or notice to his parents. Subsequently, on October 11, he left school citing as a reason admission to a private school. Between October of 1978 and April of 1979, John spent considerable time in Contra Costa County Juvenile Hall and residential facilities. Respondent school district neither assessed John during this period nor developed a new IEP for him. His parents attempted to place him in private schools in November of 1978, and again in January of 1979, without success. John's probation officer recommended placement at Byron's Boy's Ranch, a county residential school facility, but the child's parents sought other placement in private schools and withdrew John from the public school system by January of 1979.

In January of 1979, John's parents contacted the school district. Audrey Catlin, respondent school's social worker, visited John at juvenile hall, and recommended long-term residential placement in an "open setting." On January 18, 1979, an Education Assessment Service (EAS) meeting was held, with both Mr. and Mrs. K. in attendance together with the EAS staff, to discuss John's placement. In January and February of 1979, the EAS staff met informally without John's parents to discuss the case and prepare for upcoming meetings. In February and March of 1979 additional EAS conferences were held with John's parents, who requested that any final placement decision be delayed pending the outcome of juvenile court proceedings involving John.

John's parents were interested in placing John at Provo Canyon School (PCS), a private, locked residential school in Utah. Respondent was not convinced that PCS would be the most favorable facility in which to place John, and advised his parents that the district would not pay for the costs at a private residential school unless placement was through EAS channels.

On March 21, 1979, a juvenile court referee placed John at Boy's Center, one of respondents' facilities in the juvenile system. John's parents were dissatisfied with this placement, and appealed the decision to the Contra Costa County Superior Court. A hearing was held on April 6—without respondents' participation—at which John's parents requested placement of their son at PCS, where he had actually been enrolled since March of 1979. The court reversed the referee's decision, ordered John released from the probation department to the custody of his parents for placement at PCS and noted that John's parents, rather than the probation department or the school district would be obligated to pay for the costs of the placement.

On April 18, 1979, John's parents met with respondents to develop an IEP for John. The school district's staff recognized John's educational handicap, noted the need for "remedial instruction in the basic academic areas," and recommended "small group instruction." Without conceding that PCS was the best placement for John, respondents agreed to pay only the "educational costs" at that facility.

In light of respondents' decision to pay no more than the educational costs of John's placement at PCS, appellants requested a due process hearing to "determine fairly and impartially if the Contra Costa responsible agency is financially responsible for the residential education placement and all related services . . . at Provo Canyon School. . . ." The local fair hearing panel found that respondents were not responsible for the cost of John's placement at PCS made unilaterally by John's parents. This decision was reversed by a state administrative hearing officer on appeal, on the ground that respondents failed to assess John or develop an appropriate IEP for him in 1978.

Appellants instituted another state level administrative hearing to recover the cost of John's placement at private schools before PCS. The findings from the prior hearing were adopted, and additional reimbursement was awarded to appellants. Respondents thereafter instituted this action.

■ Appellants first complain that the trial court erred by reviewing the administrative decision in accordance with the independent judgment rule rather than a more constrained test. Relying on the United States Supreme Court decision in *Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley* (1982) 458 U.S. 176 [73 L.Ed.2d 690, 102 S.Ct. 3034], they argue that the trial court should have refrained from substituting its "own notions of sound educational policy for those of the school authorities" which it reviewed.

The review procedures under the Act are specified by 20 U.S.C. section 1415(e)(2), which provides: "Any party aggrieved by the findings and decision . . . shall have the right to bring a civil action . . . . In any action brought under this paragraph the court shall receive the records of the administrative proceedings, *shall hear additional evidence* at the request of a party, and, basing its decision on the *preponderance of the evidence,* shall grant such relief as the court determines is appropriate." (Italics added; see also 34 C.F.R. § 300.510 and § 300.511.) This court ruled in *San Francisco Unified School Dist.* v. *State of California* (1982) 131 Cal.App.3d 54 [182 Cal.Rptr. 525] that the review procedures specified in 20 U.S.C. section 1415(e)(2), rather than state administrative mandamus law (Code Civ. Proc., § 1094.5), must be followed in cases brought under the Act.

Section 1415, subdivision (e)(2) "contemplates a de novo appeal, in which the court is entitled to render an independent judgment on the basis

of the administrative record and any additional evidence brought to light. See S.Rep. No. 94-455 (Conference Committee) 94th Cong. 1st Sess. 50, reprinted in 1975 U.S. Code Cong. & Adm. News, 1425, 1480, 1503." (*Flavin* v. *Connecticut State Bd. of Educ.* (D.Conn. 1982) 553 F.Supp. 827, 831.) The federal courts have uniformly interpreted section 1415(e)(2) as permitting the courts to make an independent determination as part of a de novo review of administrative decisions (*Roncker on Behalf of Roncker* v. *Walter* (6th Cir. 1983) 700 F.2d 1058, 1062; *Age* v. *Bullitt County Public Schools* (6th Cir. 1982) 673 F.2d 141, 144; *Lang* v. *Braintree School Committee* (D.Mass. 1982) 545 F.Supp. 1221, 1226), rejecting the more "deferential abuse of discretion standard." (*Roncker, supra,* 700 F.2d at p. 1062.)

Recently, in *Byrnes* v. *Riles* (1984) 157 Cal.App.3d 1170 [204 Cal.Rptr. 100], a state appellate court concluded that an "independent judgment standard of review" is appropriate on appeal of an administrative hearing officer's decision pursuant to section 1415(e)(2), stating: "Legislative history regarding the [Act] specifically explains the reviewing court 'shall make an independent decision based on a preponderance of the evidence and shall grant all appropriate relief.' (1975 U.S. Code Cong. & Admin. News, at p. 1503.) [¶] Because the trial court had the power to receive additional evidence, it was necessarily required to apply the independent judgment standard of review." (*Id.,* at pp. 1176-1177.)

Arguing for a narrow standard of review, appellants stress that in *Rowley, supra,* the United States Supreme Court articulated a two-step inquiry "in suits brought under section 1415(e)(2) . . .: First, has the State complied with the procedures set forth in the Act? And second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" (458 U.S. at pp. 206-207 [73 L.Ed.2d at p. 712, 102 S.Ct. at p. 3051].) *Rowley* also requires that "due weight" be given to state administrative determinations. (*Ibid.;* see also *Roncker, supra,* 700 F.2d at p. 1062; *David H.* v. *Spring Branch Independent School District* (S.D.Tex. 1983) 569 F.Supp. 1324, 1332.)

We do not think the *Rowley* two-step inquiry is entirely appropriate here. Unlike the plaintiff in *Rowley,* appellants did not claim lack of compliance with the procedural requirements of the Act or an inadequate IEP. Instead, we are confronted with the single question of fiscal responsibility for John's residential placement. There is no dispute in the case at bench over whether the trial court substituted its "own notions of sound educational policy for those of the school authorities which they review," as *Rowley* condemned. (458 U.S. at p. 206 [73 L.Ed.2d at p. 712, 102 S.Ct. at p. 3051].) Indeed,

the state's placement of John has not been questioned, except indirectly as it relates to fiscal responsibility for such residential placement. The trial court thus did not ignore its obligation to give "due weight" to administrative placement determinations. And there is no indication in the record that the court otherwise ignored the findings made by the administrative hearing officers.

We therefore conclude that the trial court did not err by employing an independent standard of review. (*Roncker on Behalf of Roncker* v. *Walter, supra,* 700 F.2d 1058, 1062; *Byrnes* v. *Riles, supra,* 157 Cal.App.3d 1170, 1177.) Our task on appeal is "to determine whether the trial court's findings are supported by substantial evidence" (*Byrnes, supra,* at p. 1177), although, like the trial court, we are obliged to give due deference to the administrative determinations. (*Rowley, supra,* 458 U.S. 176.)

Turning to the substance of the appeal, we address appellants' contention that respondents should be charged with the entire cost of John's residential placement at PCS. ▇▇▇ Appellants rely on the well-settled rule that, if private residential placement is necessary to provide a handicapped child with an appropriate education, such a program, including nonmedical care and room and board, shall be provided at no cost to the parents of the child. (34 C.F.R. § 300.302; *Kruelle* v. *New Castle County Sch. Dist.* (3d Cir. 1981) 642 F.2d 687, 692; *Christopher T.* v. *San Fran. Unif. Sch. Dist.* (N.D.Cal. 1982) 553 F.Supp. 1107, 1119; *Gladys J.* v. *Pearland Independent School Dist.* (S.D.Tex. 1981) 520 F.Supp. 869, 875.) The school district acknowledges its general obligation to pay the costs of appropriate agreed-upon residential placement of a handicapped child, but claims that the unilateral placement of John at PCS by his parents, which was not done pursuant to an IEP, precludes any claim for reimbursement of educational costs in the present case.

Respondents' contention is based on the "stay put" requirement of the Act, 20 United States Code section 1415(e)(3), which directs that "[d]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . . ." The California "stay put" provision is similar, requiring the student to "remain in his or her present placement" during "the pendency of the hearing proceedings . . . ." (Ed. Code, § 56505, subd. (d).) The purpose of the "stay put" requirement is to insure that the student is protected by maintenance of the status quo until resolution of any dispute over placement. (*Tilton, by Richards* v. *Jefferson County Bd. of Educ.* (6th Cir. 1983) 705 F.2d 800, 804; *Stacey G.* v. *Pasadena Independent Sch. Dist.* (5th Cir. 1983) 695 F.2d 949, 953.)

The consequences of violating the "stay put" requirement are stated in 34 Code of Federal Regulations section 300.403 (1984), as follows: "If a handicapped child has available a free appropriate public education and the parents choose to place the child in a private school or facility, the public agency is not required by this part to pay for the child's education at the private school or facility." (See also 34 C.F.R. § 104.33(c)(4) (1984), promulgated under § 504 of the Rehabilitation Act of 1973.) Thus, as noted in *Newport-Mesa Unified School Dist.* v. *Hubert* (1982) 132 Cal.App.3d 724, 728 [183 Cal.Rptr. 334]: "[A] school district is not required to pay for a student's private school education if he or she is placed there by his or her parents and there is an available free appropriate public education. (34 C.F.R. § 300.403(a); Ed. Code, § 56325, subd. (a).)" (See also *Stacey G.* v. *Pasadena Independent Sch. Dist., supra,* 695 F.2d 949, 953; *Ahern* v. *Keene* (D.Del. 1984) 593 F.Supp. 902, 913.)

■ The "stay put" provision requires the school district to continue to fund a current placement while proceedings are pending; at the same time it imposes a reinforced duty upon parents to refrain from engaging in self-help by unilaterally changing the child's educational assignment. (*Stacey G.* v. *Pasadena Independent Sch. Dist., supra,* 695 F.2d 949, 953; *Stemple* v. *Board of Ed. of Prince George's Cty.* (4th Cir. 1980) 623 F.2d 893, 897.) It is the settled rule that a school district is not required to assume the cost of private residential placement incurred by the parents' unilateral decision to transfer their child from the public school system to a private facility. (*Scokin* v. *State of Texas* (5th Cir. 1984) 723 F.2d 432, 438; *Marvin H.* v. *Austin Independent School Dist.* (5th Cir. 1983) 714 F.2d 1348, 1353; *Vander Malle* v. *Ambach* (2d Cir. 1982) 673 F.2d 49, 52; *Doe* v. *Anrig* (D.Mass. 1983) 561 F.Supp. 121, 129; *Byrnes* v. *Riles, supra,* 157 Cal.App.3d 1170, 1180.)

In *Stemple* v. *Board of Ed. of Prince George's Cty., supra,* 623 F.2d 893, 897, the court declared that the "stay put" requirement "negates any right on the part of parents . . . to elect unilaterally to place their child in a private school and recover the tuition costs thus incurred." As explained in *Doe* v. *Arnig, supra,* 561 F.Supp. 121, 129: "To permit reimbursement when the parents, without excuse, unilaterally transferred the child to a private placement during the review process could only serve to encourage parents to disregard the statutory scheme . . . ."

Thus, in *Newport-Mesa Unified School Dist.* v. *Hubert, supra,* 132 Cal.App.3d 724, reimbursement for private school tuition was denied on the ground that the parents unilaterally enrolled their handicapped child in a private facility during the pendency of due process proceedings to determine appropriate placement. The court concluded that the statutory scheme,

and particularly the "stay put" provision, "indicates congressional concern for the child who is inappropriately placed, but also shows an intent that the problem be remedied through the impartial hearing process and not by unilateral action." (*Id.*, at p. 733.) The court added: "Although the statutes do not address the issue of reimbursement if parents should violate the 'stay put' provision, it is inconceivable that the procedural system structured by Congress and adopted by the California Legislature would require parents to be compensated for costs they incurred in violating that very system." (*Id.*, at p. 731.)

■   Appellants argue that the "stay put" provision is inapplicable here because no hearing procedure was pending when John was placed at PCB by his parents; they would have the "stay put" requirement operative only after a hearing procedure has been commenced. We disagree.

Section 1415(e)(3) is not so limited in its effect. The "stay put" requirement is, according to the statute, applicable "[d]uring the pendency of any *proceedings* conducted pursuant to this *section . . . .*" (Italics added.) Section 1415 enumerates not only the due process *hearing* provisions (§ 1415, (b)(2), (c), (d) and (e)), but also specifies the pre-hearing rights of parents to examination of records, notice of change of placement, and participation in assessment and placement decisions (§ 1415 (b)(1)).[1] All such "proceedings" are spelled out in the section.

When John was placed at PCS by his parents in March of 1979, the proceedings specified in section 1415 were pending: he had received an IEP;

---

[1] 20 United States Code section 1415 (b)(1) provides in full:

"The procedures required by this section shall include, but shall not be limited to—

"(A) an opportunity for the parents or guardian of a handicapped child to examine all relevant records with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child;

"(B) procedures to protect the rights of the child whenever the parents or guardian of the child are not known, unavailable, or the child is a ward of the State, including the assignment of an individual (who shall not be an employee of the State educational agency, local educational agency, or intermediate educational unit involved in the education or care of the child) to act as a surrogate for the parents or guardian;

"(C) written prior notice to the parents or guardian of the child whenever such agency or unit—

"(i) proposes to initiate or change, or

"(ii) refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child;

"(D) procedures designed to assure that the notice required by clause (C) fully inform the parents or guardian, in the parents' or guardian's native language, unless it clearly is not feasible to do so, of all procedures available pursuant to this section; and

"(E) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."

he had an existing placement; assessment procedures for the purpose of implementing a new IEP and placement for 1979, with participation of the child's parents, had commenced. In addition, a hearing in the juvenile court system to determine John's placement had been held. His parents were unhappy with the placement ordered by the juvenile court referee—at Boy's Center—and hence filed an appeal and unilaterally enrolled the child at PCS. Thus, while due process hearing procedures had not yet been instituted when John's parents violated the "stay put" requirement, the proceedings conducted pursuant to section 1415 were in motion at the time of his placement at PCS.

If, as suggested by appellants, we were to rule that only formal initiation of the due process hearing procedures triggers the "stay put" requirement of section 1415(e)(3), the objective of the statute—to maintain the status quo during placement disputes—would be compromised. As we view the statutory scheme, it is just as important to maintain a current placement before the filing of a formal complaint (20 U.S.C. § 1415(e)(3)) as after the actual hearing process has commenced.

So held the court in *Stemple* v. *Bd. of Ed. of Prince George's Cty.*, *supra*, 623 F.2d 893, explaining: "We do not think that the application of [section 1415 (e)(3)] depends upon the fine distinction between whether proceedings under [section 1415] are initiated before or after the duty to preserve the status quo is breached. The duty, it seems to us, arises as soon as school authorities make a decision as to identification, evaluation and placement of a handicapped child and continues until a decision not to contest it is reached or, if a contest ensues, until that contest is finally determined." (*Id.*, at p. 898.)

Accordingly, notwithstanding the fact that neither a formal complaint nor a due process hearing had been initiated, we conclude that the "stay put" requirement was in effect when John's parents unilaterally placed him at PCS. (See *Marvin* v. *Austin Independent School Dist.*, *supra*, 714 F.2d 1348; *Stemple* v. *Bd. of Ed. of Prince George's Cty. supra*, 623 F.2d 893, 898; *Foster* v. *District of Columbia Bd. of Ed.* (D.C.Cir. 1981) 523 F.Supp. 1142, 1144; *Tatro* v. *State of Texas* (N.D.Tex. 1981) 516 F.Supp. 968, 978.)

Appellants next contend that the IEP of April 1979 ratified John's parents' placement decision, and must be construed as an agreement by respondents to pay the costs of the private residential program at PCS. In appellants' view the IEP is binding upon respondents "and converts a unilateral placement into a 'bilateral' placement," thus overcoming the "stay put" violation.

The record, however, does not establish that respondents voluntarily assumed financial responsibility for *all* costs of John's residential placement at PCS. Nor did respondents agree to reimburse appellants by adopting the IEP in April of 1979. Instead the EAS staff merely recommended that respondents pay the basic educational costs of placement at PCS. Respondents never determined that PCS was an appropriate placement and in fact suggested alternative public residential facilities for John, such as Byron's Boys' Ranch. Rather than establishing respondents' concurrence in the unilateral placement, the evidence tends to show that respondents agreed to accept only limited financial responsibility for the costs of a private residential facility for the child as a compromise measure when faced with a juvenile court order and the fact of John's physical presence at PCS.

In our view, the IEP of April 1979 cannot give retroactive validity to the unilateral placement of John by his parents. The parties may have reached a decision upon placement, but they had not resolved the issue of attendant financial responsibility. A school district is obligated to fund a placement as promised (*Jacobsen* v. *District of Columbia Bd. of Educ.* (D.C.Cir. 1983) 564 F.Supp. 166, 171-172), but specifically enumerated limitations upon fiscal responsibility must be recognized. (*Zvi D.* v. *Ambach* (E.D.N.Y. 1981) 520 F.Supp. 196, 203.) In the absence of a promise or assurance by the school district that it would pay *all* costs of the unilateral placement of John at PCS, appellants cannot rely on the IEP as an after-the-fact assumption of full fiscal responsibility by the school district. (*Zvi, supra,* at p. 203.)

Appellants also complain that the failure of respondents to comply with the procedural requirements of the Act or to provide John with an appropriate education sanctions their unilateral placement and requires respondents to assume the costs of the child's private residential educational program at PCS. Appellants submit that the school district ignored its obligation by (1) failing to assess John or develop a new IEP for him during the fall and winter of 1978-1979, (2) unreasonably delaying placement of him in an appropriate educational facility, and (3) excluding his parents from the assessment procedure.

■ The rule denying reimbursement or compensation to parents for unilateral placement of a handicapped child in a private residential facility is subject to established exceptions, as where the school district has acted in bad faith by egregiously failing to comply with the procedural requirements of the Act. (*Scokin* v. *State of Texas, supra,* 723 F.2d 432, 439; *Anderson* v. *Thompson* (7th Cir. 1981) 658 F.2d 1205, 1214 [63 A.L.R.Fed. 197]; *Parker* v. *District of Columbia* (D.D.C. 1983) 588 F.Supp. 518, 521; *William S.* v. *Gill* (N.D.Ill. 1983) 572 F.Supp. 509, 516.) In *Foster* v. *District*

*of Columbia Bd. of Ed., supra,* 523 F.Supp. 1142, 1146, the court noted that the "stay put" requirement "need not be construed as an absolute bar to all retroactive tuition payments. Self-help may be sanctioned, indeed requisite, in some exceptional cases, with unique factual occurrences, where the parent has exhausted all other avenues for relief or other considerations of justice compel it."

Well-reasoned recent cases witness a move away from inflexibility when applying the provisions of the Act, particularly the "stay put" requirement. The right to reimbursement following unilateral placement is, in our view, properly based upon a determination of whether the school district proposed and had the capacity to implement an appropriate IEP, thereby fulfilling its obligation to provide an appropriate education for the child. (See *Doe* v. *Brookline School Committee* (1st Cir. 1983) 722 F.2d 910, 920-921, and cases therein cited.) Equitable considerations such as the effectiveness of the existing IEP and the reasonableness of the parties' actions must be taken into account.

■ As we view the record, it can hardly be doubted that by late 1978 John's placement at Campolindo, a public high school, had become entirely inappropriate. A pattern of chronic truancy and troublemaking had now become evident. Moreover, the school district had been fully cognizant of John's severe behavioral problems since early 1978, but did nothing to alter his placement during the 1977-1978 school year. Nor did the district respond to the clear necessity for a change in placement in the fall of 1978. Despite the palpable need for a reassessment of John's placement and development of an appropriate IEP, respondents took no remedial steps. As a result, John languished in the juvenile court system without effective educational placement.

Respondents contend that John's chronic truancy and status as a ward of the juvenile court prevented his being reassessed and so absolved the district from responsibility for providing John with an appropriate education. But the law does not abandon handicapped children to the jurisdiction of juvenile authorities. According to 20 United States Code section 1412(6), a state educational agency must provide "educational programs for handicapped children" in compliance with the Act, "including all such programs administered by any other State or local agency . . . ." Certainly Congress did not intend to suspend the right of incarcerated handicapped children whose very disabilities render appropriate treatment difficult. (*Green* v. *Johnson* (D.Mass. 1981) 513 F.Supp. 965, 976.)

John's status within the juvenile court system was well-known to respondents, who nonetheless failed to undertake diagnostic reassessment and

placement process between February of 1978 and at least January of 1979. Meanwhile, despite the woeful inadequacy of his placement at Campolindo, John was neither given an IEP nor reassessed after September of 1977. The failure of the district in this respect clearly violated 34 Code of Federal Regulations section 300.343, which requires "*annual* review of the IEP." (*Doe* v. *Anrig, supra,* 561 F.Supp. 121, 128, italics added.)

Faced with the fact of a manifestly inappropriate placement, respondents took no action. Indeed, even after John was suspended from Campolindo in October of 1978, for reasons which spoke eloquently of the need for reassessment of his status, no new placement was considered, let alone devised. It is settled law that expulsion of an inappropriately placed handicapped student for disruptive behavior *caused by the handicap* is improper, particularly if the procedures outlined in the Act for changing educational placement are not followed beforehand. (*Kaelin* v. *Grubbs* (6th Cir. 1982) 682 F.2d 595, 602; *S-1* v. *Turlington* (5th Cir. 1981) 635 F.2d 342, 348; *Doe* v. *Koger* (N.D.Ind. 1979) 480 F.Supp. 225, 229.) While the record does not tell us whether John was expelled or merely suspended,[2] it leaves no doubt that his needs were ignored. Not only did he not receive a new IEP or placement, but respondents never attempted to compel his attendance at Campolindo.

That John's problems were formidable and extremely difficult for diagnosis and treatment does not extenuate respondents' long period of inaction. It was not until early 1979 that respondents' viable alternative placement was considered and suggested. The case is not, therefore, one in which the student merely experienced a "period of regression," such as was considered insufficient to justify unilateral placement in *Scokin* v. *State of Texas, supra,* 723 F.2d 432, 439. Rather, John's parents were faced with an obviously inappropriate placement and prolonged inaction by the school district. And while the record discloses that public residential schools operating in the district may well have been more appropriate for John, respondents gave no serious consideration to such alternatives. In the context of a plainly inappropriate, current placement, such inaction on respondents' part in our opinion justified unilateral placement by John's parents. (*Doe* v. *Brookline School Committee, supra,* 722 F.2d 910, 921; *Parker* v. *District of Columbia, supra,* 588 F.Supp. 518, 520-521.)

We are aware that John's parents could have initiated the due process procedures specified in the Act (20 U.S.C. § 1415) to challenge the child's

---

[2]Temporary suspension of a handicapped child is authorized even without employing the procedures in 20 United States Code section 1415. (*Kaelin, supra; Stuart* v. *Nappi* (D.Conn. 1978) 443 F.Supp. 1235, 1242.)

current placement. (*Foster* v. *District of Columbia Bd. of Ed.*, *supra*, 523 F.Supp. 1142, 1146.) But presented as they were with a serious disciplinary problem and lack of any tangible response by the school district—except to remove John from the public school without offering an alternative placement—it is difficult to fault their response, particularly if one considers that they had sought and obtained an order from the juvenile court referee finding John's placement at PCS to be appropriate.

On balance, and with due deference to the administrative findings, we find that appellants have demonstrated exceptional circumstances, including bad faith on the part of respondents, which justify the unilateral placement of John in a private residential facility. (*Parker* v. *District of Columbia*, *supra*, 588 F.Supp. 518, 522; *Doe* v. *Arnig*, *supra*, 561 F.Supp. 121, 128.) We accordingly find the trial court's determination to be unsupported by substantial evidence, and hence an abuse of discretion.

■ Appellants also seek an award of attorneys' fees, citing as authority California Government Code section 800, the Civil Rights Attorney's Fees Award Act (42 U.S.C. § 1988) and section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

Government Code section 800, however, authorizes an award of attorneys' fees where "the award, finding, or other determination of such proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his official capacity . . . ." Appellants contend that respondents' failure to reassess John constituted "arbitrary and capricious action."

"Although the term 'arbitrary or capricious action or conduct,' as used in Government Code section 800, has no precise meaning and is not defined by that section, it has been characterized as 'conduct not supported by a fair or substantial reason' (*A.B.C. Federation of Teachers*, *supra*, 75 Cal.App.3d 332, 343), or 'unsubstantiated determinations.' (*Ibid.*)" (*Reeves* v. *City of Burbank* (1979) 94 Cal.App.3d 770, 776 [156 Cal.Rptr. 667].) We consider the district's conduct "arbitrary and capricious" under this definition, and accordingly conclude that appellants are entitled to attorneys' fees in the present proceeding.

The judgment is reversed and the case is remanded to the trial court for the purpose of determining the appropriate amount of reimbursement for the costs of John's placement at PCS and attorneys' fees to be awarded to appellants.

Racanelli, P. J., concurred.

**HOLMDAHL, J.**—I respectfully dissent.

The lead opinion concedes that "John's problems were formidable and extremely difficult for diagnosis and treatment." I agree. However, taking into account "[e]quitable considerations such as the effectiveness of the existing IEP and the reasonableness of the parties' actions," I am unable to concur in the ultimate conclusion of the opinion that the respondents acted with "bad faith."

That ultimate conclusion is based upon numerous criticisms concerning respondents' alleged shortcomings during the 1977-1978 and 1978-1979 school years. Yet, respondents, attempting to meet their responsibilities, conducted numerous meetings and consultations with John, his parents, and others during those years. While no new Individualized Education Program (IEP) was devised for John during 1978, his parents in February agreed to continue with the IEP established in the previous September and in the fall of 1978, "with the participation of his parents . . . it was tentatively decided that his IEP would remain unchanged in high school." John's increasing truancy and custody by the juvenile authorities then occurred, as well as his parents' efforts to place him in a private school. By January, 1979, John's parents had withdrawn him from the public school system. Yet, respondents conducted numerous consultations with his parents in January, February, March, and April 1979, concerning his placement and development of a new IEP. And, in March 1979, his parents enrolled him at Provo Canyon School (PCS). That placement at PCS was unilateral.

I am unable to conclude that respondents' efforts, only partially and briefly described above, provide any basis for a finding of "bad faith" or "arbitrary and capricious" action.

I would affirm the judgment.

A petition for a rehearing was denied August 29, 1985. Holmdahl, J., was of the opinion that the petition should be granted. The petition of respondent La Pointe for review by the Supreme Court was denied October 23, 1985.